IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>DARRELL BRAD STARR,<br><br>Defendant. | MEMORANDUM DECISION<br>AND ORDER<br><br><br><br><br>Case No. 2:12-CR-764<br><br>Judge Dee Benson |

This matter is before the court on defendant's motion to suppress. (Dkt. No. 21.) On April 30, 2013, the court conducted an evidentiary hearing on the motion. Defendant Darrell Brad Starr was present with his counsel, David Finlayson. The government was represented by Amy Jones and Drew Yeates. Following the hearing, the court ordered a transcript and set a briefing schedule. Thereafter, at the parties' request, the court heard oral argument on the matter. After review and consideration of the memoranda submitted by the parties, the testimony presented at the evidentiary hearing, and the oral arguments presented by counsel, the court enters the following Memorandum Decision and Order.

**BACKGROUND**

The parties do not dispute the underlying facts and the court finds the relevant facts as

follows.[1]  On November 30, 2012, Officer Deven Meyer of the West Valley Police Department

performed a routine traffic stop of a vehicle after finding (1) the vehicle's registration had

expired, and (2) the vehicle had no rear illumination of the license plate, in violation of Utah law.

(Tr. at 6.)  Upon approaching the vehicle, Officer Meyer advised the driver, Yvette Bickley, of

the reason for the stop and asked for her driver's license.  (Tr. at 9.)  When Ms. Bickley informed

Officer Meyer that she did not have her driver's license with her, Officer Meyer asked for her

name, date of birth, and information about the vehicle.  (Tr. at 9.)  Officer Meyer testified that

during their interaction, he noticed Ms. Bickley was "involuntarily twitching" and had a

"difficult time sitting still and concentrating."  (Tr. at 10.)  Officer Meyer testified that he

suspected Ms. Bickley's behavior could be related to drug abuse.  (Tr. at 11.)  After Ms. Bickley

said she had no identification, Officer Meyer asked the passenger, the defendant in this case,

Darrell Brad Starr, if he had any identification.  (Tr. at 11.)  Officer Meyer testified that he asked

the passenger for identification because he wanted "to be able to identify someone in the vehicle

[to make sure ] they were not giving me any sort of false information as to who they were."  (Id.)

The defendant said he did not have any identification, but provided his name and date of birth.

(Tr. at 12.)

Officer Meyer returned to his vehicle to run both the defendant and Ms. Bickley's names

through Spillman – a statewide stervice that provides information about a person's driver's

license, warrants, criminal history, and NCIC information.  Officer Meyer also ran the defendant

and Ms. Bickley's names through the statewide criminal history database known by the acronym

---

[1]Reference to the transcript of the evidentiary hearing conducted on April 30, 2013, will
be cited as "Tr. at __."

UCJIS, and the local West Valley system. (Tr. at 12-14.) The databases returned information

indicating that both Ms. Bickley and the defendant had criminal histories related to drugs, and

Ms. Bickley had been involved with a clandestine laboratory used for making methamphetamine.

(Tr. at 14 - 15.) Given the computer results indicating that both of the vehicle's occupants had a

drug history, combined with Ms. Bickley's actions, which suggested to the officer that she was

possibly high on methamphetamine, Officer Meyer asked dispatch to send a K-9 unit to his

location. (Tr. at 15.) There were K-9 officers working in the area at the time of the stop and

Officer Meyer understood that a K-9 unit would be responding. (Tr. at 16.)

In the meantime, Officer Meyer continued to investigate the status of Ms. Bickley's

driver's license. Officer Meyer learned via his computer inquiries that Ms. Bickley's license had

been "denied" and she was not legally permitted to operate a motor vehicle. (Tr. at 17.) As

Officer Meyer continued to investigate the driver's licenses of the vehicle's occupants, and

within ten minutes of the initial traffic stop, Officer Hoover arrived with a K-9 unit. (Tr. at 18.)

Additional officers and Officer Dellinger's K-9 unit also arrived on scene. (Tr. at 18.)

Officer Meyer approached the vehicle and driver, Ms. Bickley, and asked her to step out

of the car. Officer Meyer then explained the reason for the traffic stop, and informed Ms.

Bickley that he was going to issue her a citation for driving on a denied driver's license. (Tr. at

19-20.) Following this conversation, Officer Meyer began drafting the citation. As he was

doing so, Officer Delligner interrupted Officer Meyer and asked Officer Meyer if he would have

the passenger exit the vehicle so the K-9 could perform a sniff.[2] Officer Meyer stopped writing

---

[2]The parties stipulated that the reason Officer Dellinger asked to have Mr. Starr exit the
vehicle during the K-9 sniff is because his dog, Sam, is trained to search for both narcotics and

the citation and approached the passenger side of the vehicle.  As Officer Meyer approached, rather than rolling down the window, Mr. Starr opened the passenger-side door.  (Tr. at 22.) Following routine procedure and for officer safety purposes, before asking Mr. Starr to exit the vehicle, Officer Meyer asked Mr. Starr "if he had any weapons on him."  (Tr. at 22 & 23.)  Mr. Starr responded: "Yes, I do.  I have a loaded firearm concealed under my jacket."  (Tr. at 22.) Officer Meyer had learned during his records check that neither Ms. Bickley nor Mr. Starr had a concealed weapons permit.  (Tr. at 23.)

Officer Meyer instructed Mr. Starr to exit the vehicle and proceeded to handcuff Mr. Starr and walk him back to the police vehicle where Officer Meyer retrieved the weapon.  Mr. Starr was detained at this point for the investigation of carrying a concealed weapon without a valid permit.  (Tr. at 38.)  While Officer Meyer was retrieving the gun, Officer Dellinger executed the drug sniff of the vehicle.  During the execution of the drug sniff, the dog detected the odor of narcotics, although none were found in the vehicle.  (Tr. at 26.)  Officer Meyer then searched the defendant and found both methamphetamine and marijuana in the defendant's jacket, as well as a number of unlabeled pills.  (Tr. at 26-28.)  Officer Meyer then informed the defendant of his Miranda rights and interviewed the defendant for investigative purposes.  (Tr. at 28.)  After being formally placed under arrest and transported to jail, Officer Meyer found additional methamphetamine hidden in the defendant's buttocks and a large amount of cash in his wallet.  (Tr. at 29-30.)

On December 12, 2012, Mr. Starr was charged in a four-count indictment with:

---

people.  Mr. Starr was removed from the vehicle so that the dog would focus on any possible narcotics rather than people inside the vehicle.  (Tr. at 47.)

possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1);

possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §

924(c); drug user in possession of a firearm and ammunition, in violation of 18 U.S.C. 922(g)(3);

and domestic violence misdemeanant in possession of a firearm and ammunition, in violation of

18 U.S.C. § 922(g)(9).  Thereafter, Mr. Starr moved to suppress "all evidence obtained as a

result of [the] traffic stop."  (Dkt. No. 21.)  Mr. Starr asserts that the detention exceeded the

scope of the traffic stop in violation of his Fourth Amendment rights.  (Dkt. No. 3.)  Both the

government and Mr. Starr agree that the sole issue in this case is whether Officer Meyer

unlawfully exceeded the scope of what was otherwise a lawful traffic stop and detention when

Officer Meyer ceased drafting the traffic citation in order to ask Mr. Starr to exit the vehicle so

the K-9 unit could perform a drug sniff.

## **DISCUSSION**

The Fourth Amendment to the United States Constitution protects citizens from

unreasonable searches and seizures by government actors.  See U.S. Const. Amend. IV; United

States v. Sanchez, 89 F.3d 715, 717 (10th Cir. 1996).  "[T]he underlying command of the Fourth

Amendment is always that searches and seizures be reasonable."  Wilson v. Arkansas, 514 U.S.

927, 931 (1995).  It is well established that a routine traffic stop and investigative detention, such

as the one at issue in this case, is a seizure within the meaning of the Fourth Amendment.  United

States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995), cert. denied, 518 U.S. 1007 (1996).

The reasonableness of such detentions is reviewed under a two-part test set forth in Terry v.

Ohio, 392 U.S. 1, 20 (1968).  Under that test, the court must make a dual inquiry asking first

whether the officer's action was justified at its inception and second whether it was reasonably

related in scope to the circumstances which justified the interference in the first place.  United

States v. Williams, 271 F.3d 1262, 1266 (10th Cir. 2001), cert. denied, 535 U.S. 1019 (2002).

The parties do not dispute that the initial traffic stop was justified at its inception.[3]

Accordingly, the court's focus in this case is "whether the officer's actions during the detention

were reasonably related in scope to the circumstances which justified the interference in the first

place."  Terry, 392 U.S. at 20.  The defendant asserts Officer Meyer unlawfully exceeded the

scope of the detention when he stopped drafting the traffic citation in order to have Mr. Starr exit

the vehicle for a drug sniff.[4]   The court disagrees.

### Officer Meyer Did Not Exceed the Scope of the Detention

The United States Supreme Court has made clear that "an investigative detention must be

temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope

of the detention must be carefully tailored to its underlying justification."  Florida v. Royer, 460

U.S. 491, 500 (1983).  With regard to permissible conduct during a traffic stop, the United States

Court of Appeals for the Tenth Circuit has established that the detaining officer "may run

computer checks on the driver's license, the vehicle registration papers, and on whether the

driver has any outstanding warrants or the vehicle has been reported stolen."  United States v.

---

[3]The vehicle was stopped for having an expired registration and no illumination of the
rear license place, both of which violate the Utah Motor Vehicle Act and the Utah Criminal and
Traffic Code.  See Utah Code Ann. § 41-1a-201 and § 41-6a-1604.

[4]The defendant expressly acknowledges that "[h]ad the K-9 officers removed Mr. Starr
and conducted a canine sniff while Officer Meyer was conducting his records check, then no
Fourth Amendment violation would have occurred."  (Dkt. No. 31, Def.'s Mem. In Support at 6.)

Mendez, 118 F.3d 1426, 1429 (10th Cir. 1997). "The officer may detain the driver and his vehicle as long as reasonably necessary to make these determinations and to issue a citation or warning." United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997). Additionally, "because passengers present a risk to officer safety equal to the risk presented by the driver, an officer may ask for identification and run background checks on them as well." United States v. Rice, 483 F.3d 1079, 1084 (10th Cir. 2007). Accordingly, Officer Meyer acted appropriately in requesting the defendant's identification and then detaining the defendant long enough to obtain the results of the legitimate computer inquiries.

Moreover, the court concludes that Officer Meyer did not unreasonably exceed the scope of the detention in requesting a K-9 unit to respond and perform a drug sniff. The United States Supreme Court, in Illinois v. Caballes, 543, U.S. 405 (2005), concluded that a drug sniff during a routine traffic stop does not "rise to the level of cognizable infringement" of a motorist's Fourth Amendment rights, such as would have to be supported by some "reasonable, articulable suspicion," so long as the defendant is not detained beyond the time reasonably required to complete the traffic stop. Id. at 407-09. As long as the stop was not unduly prolonged in order to bring the dog to the scene, there is no illegal detention. Id. In this case, Officer Meyer called for the K-9 unit while he was running the defendant's and the driver's information through the various databases. The K-9 unit arrived within ten minutes of the initial stop and during the time in which Officer Meyer was investigating the circumstances of the initial traffic stop and issuing a citation.

Of more significance for purposes of this case, the court further concludes that Officer

Meyer's decision to briefly cease drafting the citation in order accommodate Officer Dellinger's request that the defendant be removed from the vehicle did not unreasonably prolong the detention. As previously explained, because the K-9 was trained to search for both humans and drugs, it was important to have all occupants removed from the vehicle. (Tr. at 47.) In Maryland v. Wilson, 519 U.S. 408 (1997), the Supreme Court explicitly held "that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." Id. at 415. Finally, in removing the defendant from the vehicle, Officer Meyer was lawfully permitted, for officer safety purposes, to ask the defendant if he was carrying any weapons. United States v. Stewart, 473 F.3d 1265, 1268-69 (10th Cir. 2007).

In sum, the court concludes that Officer Meyer's conduct – interrupting the drafting of the traffic citation in order to ask Mr. Starr exit the vehicle – did not unreasonably exceed the scope of the initial detention.

### Officer Meyer Had Reasonable, Articulable Suspicion

Moreover, even if this court were to have concluded that Officer Meyer's conduct (i.e., ceasing to draft the traffic citation in order to ask Mr. Starr to exit the vehicle) unreasonably exceeded the scope of the initial stop and detention, the court concludes that Officer Meyer had reasonable suspicion of criminal activity sufficient to justify the prolonged detention. It is well established that "[a]n investigative detention may be expanded beyond its original purpose . . . if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis" for suspecting criminal activity. United States v. Villa-Chaparro, 115 F.3d 797, 801-02 (10th Cir.), cert. denied,

522 U.S. 926 (1997).

The standard for evaluating whether an officer could have had a reasonable suspicion of illegal activity is an objective one. See id. at 802. Whether the subsequent detention is supported by reasonable suspicion of illegal activity does not depend upon any one factor but on the totality of the circumstances. United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995). By definition, the totality of the circumstances includes all circumstances known to the officer at the time, as well as reasonable inferences and conclusions that may be drawn by the officer. Moreover, in determining reasonableness, the officer's conduct should be viewed with "common sense' considering 'ordinary human experience.'" Villa-Chaparro, 115 F.3d at 801 (quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)).

In this case, when Officer Meyer made the decision to stop drafting the traffic citation long enough to ask Mr. Starr to exit the vehicle for a drug sniff, Officer Meyer was in possession of the following information. Officer Meyer had noticed that the driver of the vehicle was "involuntarily twitching," and that she had a difficult time sitting still and concentrating. Officer Meyer suspected this behavior could be the result of drug use. (Tr. at 10-11.) He also knew that the driver was not lawfully operating the vehicle and that her driver's license had been "denied." See United States v. Robles, 313 F. Supp. 2d 1206, 1216 (D. Utah 2004) ("[I]n the context of a traffic stop, courts have concluded that driving without a valid driver's license may support a finding of reasonable suspicion."). Moreover, Officer Meyer was also aware that both of the vehicle's occupants had criminal histories related to drugs. See United States v. Simpson, 609 F.3d 1140, 1147 (10th Cir. 2010) ("[I]n conjunction with other factors, criminal history

contributes powerfully to the reasonable suspicion calculus.").

In light of these facts, and based on the totality of the circumstances, the court concludes that Officer Meyer would have been justified in briefly prolonging the initial detention of the defendant long enough to ask the defendant to exit the vehicle so the K-9 unit could perform a drug sniff.

Accordingly, and for the foregoing reasons, defendant's motion to suppress is DENIED.

DATED this 12th day of September, 2013.

_____
Dee Benson
United States District Judge